UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
Y. STROHL,

                Plaintiff,                          MEMORANDUM
  -against-                                            AND ORDER

BRITE ADVENTURE CENTER, INC., a/k/a        08 CV 259 (RML)
BRIGHT BEGINNINGS PRE-SCHOOL, and
ADVENTURELAND CHILD CARE CENTER,
INC.,
                Defendants.
----------------------------------------------------------------X

LEVY, United States Magistrate Judge:

        Defendants Brite Adventure Center, Inc. a/k/a Bright Beginnings Pre-School ("Brite") and Adventureland Child Care Center, Inc. ("Adventureland") (collectively, "defendants") move for summary judgment pursuant to Federal Rule of Civil Procedure 56. By stipulation dated May 28, 2008 the parties consented to the jurisdiction of a Magistrate Judge for all purposes including the entry of judgment, pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, defendants' motion for summary judgment is granted with respect to plaintiff's claim under New York Labor Law section 193 and denied in all other respects.

### BACKGROUND AND PROCEDURAL HISTORY

        This case arises out of the termination of Yajaira Strohl ("plaintiff") from her job as a teacher's assistant at Brite. Plaintiff requested permission to miss work on January 23, 2007 to attend medical and other appointments. (See Affidavit of Yajaira Strohl in Opposition to Motion for Summary Judgment ("Strohl Aff."), dated Jan. 4, 2009, ¶¶ 13-15; see also Memorandum of Law in Support of Defendant Brite Adventure Center, Inc. a/k/a Bright Beginnings Pre-School's Motion for Summary Judgment Dismissing Plaintiff's Amended Complaint ("Brite's Mem."), dated Dec. 17, 2008, at 5-7) Brite initially approved her request, but on January 22, 2007 it withdrew its permission and informed her that by missing work the

next day she would risk termination. (See Strohl Aff. ¶¶ 15, 17; see also Brite's Mem. at 7.) Plaintiff declared she would nevertheless miss work the next day, and Brite terminated her employment. (See Strohl Aff. ¶¶ 18-19; see also Plaintiff's Brief in Opposition to Motion for Summary Judgment ("Pl.'s Mem."), dated Jan. 5, 2009, at 7.)

Plaintiff commenced this action in January 2008 (see Complaint, filed Jan. 17, 2008) and filed an amended complaint in July 2008 (see Amended Complaint, filed July 23, 2008 ("Am. Compl.")). She asserts that she "suffers from chronic migraine headaches" (Am. Compl. ¶ 10), that "[t]his condition was known to" defendants (Am. Compl. ¶ 10), and that her medical appointments on January 23, 2007 were for treatment of her migraines (Am. Compl. ¶ 11). Her Amended Complaint states three causes of action: (1) that her termination was in violation of the Family and Medical Leave Act of 1993 ("FMLA") (Am. Compl. ¶¶ 13-17), (2) that defendants violated the New York City Human Rights Law by not reasonably accommodating her disability (Am. Compl. ¶¶ 18-20), and (3) that defendants failed to pay her promptly for all hours worked, in violation of New York Labor Law sections 191 and 193 (Am. Compl. ¶¶ 21-23).

Defendants advance several arguments for summary judgment under the FMLA. First, they argue that Brite but not Adventureland employed plaintiff, and that because Brite had fewer than fifty employees at all relevant times, it was never a "covered employer" under the FMLA. (See Brite's Mem. at 19-25; Memorandum of Law in Support of Defendant Adventureland Child Care Center, Inc.'s Motion for Summary Judgment Dismissing Plaintiff's Amended Complaint ("Adventureland's Mem."), dated Dec. 17, 2008, at 7-13.) Second, defendants argue that plaintiff's request for a day off for treatment for migraine headaches would not entitle her to leave under the FMLA. (See Brite's Mem. at 25-28; Adventureland's Mem. at 13-16.) Third, Brite argues that plaintiff does not satisfy the 1250-hour requirement for FMLA

jurisdiction. (See Brite's Mem. at 18-19.)

Defendants also seek summary judgment on the Human Rights Law and Labor Law claims. As for the former, Brite contends that plaintiff never gave it notice that she needed the day off for migraine care. (See Brite's Mem. at 28-29.) As for the latter, Brite argues that the facts alleged by plaintiff do not support a finding that it violated either state statute at issue. (See Brite's Mem. at 29-31.) Adventureland argues that it never employed plaintiff and thus cannot have violated any of her rights protected by those laws. (See Adventureland's Mem. at 16.)

## DISCUSSION

### A.  Legal Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a summary-judgment motion, the court must "view the evidence in the light most favorable to the party opposing the motion" and "determine [only] whether there is a genuine factual issue to be tried." Eastman Mach. Co. v. United States, 841 F.2d 469, 473 (2d Cir. 1988). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment . . . ." Atl. Mut. Ins. Co. v. CSX Lines, L.L.C., 432 F.3d 428, 433 (2d Cir. 2005) (quotation marks and citation omitted).

### B.  Whether the FMLA Covered Plaintiff's Employer

To be a "covered employer" under the FMLA, a business must "employ[] 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year." 29 U.S.C. § 2611(4)(A)(I). The parties agree that at the relevant times neither Brite nor Adventureland had enough employees to be covered on its own,

but that if their payrolls were aggregated, the total number of employees would exceed fifty. (See Pl.'s Mem. at 8-9; Defendant's [Brite's] Second Response to Plaintiff's First Request for Admissions, dated Aug. 29, 2008, attached as Ex. 3 to the Certification of David Abrams in Opposition to Motion for Summary Judgment ("Abrams Cert."), dated Jan. 5, 200[9]; Defendant's [Adventureland's] Second Response to Plaintiff's First Request for Admissions, dated Aug. 29, 2008, attached as Ex. 3 to the Abrams Cert.)

> Under the controlling regulations,
>
> Separate entities will be deemed to be parts of a single employer for purposes of FMLA if they meet the "integrated employer" test. Where this test is met, the employees of all entities making up the integrated employer will be counted in determining employer coverage and employee eligibility. A determination of whether or not separate entities are an integrated employer is not determined by the application of any single criterion, but rather the entire relationship is to be reviewed in its totality. Factors considered in determining whether two or more entities are an integrated employer include:
>
> (i) Common management;
> (ii) Interrelation between operations;
> (iii) Centralized control of labor relations; and
> (iv) Degree of common ownership/financial control.

29 C.F.R. § 825.104(c)(2). Although there is no Second Circuit caselaw interpreting the integrated employer test in the FMLA context, courts consider the same four factors under various other statutes, including the NLRA, Radio & Television Broad. Technicians Local Union 1264 v. Broad. Serv. of Mobile, Inc., 380 U.S. 255, 256 (1965) (per curiam), Title VII, Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1240-41 (2d Cir. 1995), and ADEA, e.g., Sabol v. Cable & Wireless PLC, 361 F. Supp. 2d 205, 208 n.3 (S.D.N.Y. 2005), and decisions from those contexts provide guidance here. I will consider each of the four factors.

1. Common Management

Both defendants are corporations licensed to provide day care in Queens for children between two and six years old. Brite operates facilities in Woodside and Jamaica, and Adventureland operates facilities in Woodside and Astoria. (See Transcript of Deposition of Glenn Schroter, dated Oct. 20, 2008 ("Schroter Tr."), attached as Ex. G to Declaration of Alan Kestenbaum, Esq., in Support of Defendant Brite Adventure Center, Inc. a/k/a Bright Beginnings Pre-School's Motion for Summary Judgment Dismissing Plaintiff's Amended Complaint, dated Dec. 17, 2008 ("Kestenbaum Decl."), at 22:14-23:2; see also, e.g., Brite's Mem. at 12.) Plaintiff worked for Brite at an address in Woodside where both Brite and Adventureland have operations. (See Strohl Aff. ¶ 3; Schroter Tr. at 22:14-25; see also Pl.'s Mem. at 4.) At Woodside, Adventureland provided services for children from six months to three and a half years old, and Brite provided services for children from three and a half to four and a half years old. (See Schroter Tr. at 29:15-21.)

Four members of one family are involved in the ownership and management of Brite and Adventureland: Joan Lawless, her daughters Joan M. Lawless and Annette Schroter, and Annette Schroter's husband Glenn Schroter. (See Schroter Tr. at 15:3-11, 19:6-21:21, 37:7-38:20.) The parties do not agree on the exact scope of the duties these four individuals perform for the two corporations. (Compare Pl.'s Mem. at 3 (citing Schroter Tr. at 15, 18, 46, 81-82) (asserting that "each of the 4 people performs substantially the same duties for both corporations"), with Brite's Mem. at 21 ("For [Brite], only Joan Lawless and Annette Schroter had the authority to hire and fire employees, and for [Adventureland], Joan Lawless, Anette Schroter and Joan M. Lawless had that authority."), and Transcript of Oral Argument, dated Jan.

27, 2009 ("Tr."), at 23:20-22 (defendants' counsel stating that Joan Lawless had no "role in the management of Brite").) They do agree that the four received no compensation from Adventureland during the relevant time period (see Pl.'s Mem. at 11; Tr. at 38:6-8), which could indicate that Adventureland was not a stand-alone business. Finally, Glenn Schroter's testimony from an unrelated proceeding involving an employee of both Brite and Adventureland (and a business called "Bobo Worldwide") provides further evidence of common management. (See Transcript of Hearing, dated Oct. 30, 2007 ("Bobo Tr."), attached as Exs. 1-2, 5 to Abrams Cert., at 13:22-14:1 ("Q: So, really, even though it may be for corporate purposes or on paper, it's three separate—really it was just one job. Right? A [Glenn Schroter]: Yes."), 14:16-20 ("Q: And I take it that these three entities share management and employees. A [Glenn Schroter]: Adventureland and Bright Adventures Center certainly do. Bobo is a partnership arrangement with us, there is no shared management.").)

  2. <u>Interrelation Between Operations</u>

The two defendants had separate licenses, bank accounts, employee lists, and clients, and they filed separate tax returns. (<u>See, e.g.</u>, Excerpt of Brite's 2006 New York tax return, attached as Ex. D to Kestenbaum Decl.; Excerpt of Adventureland's 2006 New York tax return, attached as Ex. K to Kestenbaum Decl.) Defendants state that "where an employee worked for both defendants, that employee was paid separately by both companies and received separate W-2's from each company" (Adventureland's Mem. at 10), and that there was only one such employee (Tr. at 23:10-12; <u>see also</u> Tr. at 26:10-12).

Plaintiff asserts that she was "nominally employed by [Brite]" but "occasionally was asked to watch children whom [she] understood were in the program of [Adventureland]."

(Strohl Aff. ¶ 6.)  Defendants dispute that plaintiff or other employees of just one corporation have ever been asked to "cover" for employees of the other corporation.  (Tr. at 26:17-27:15, 48:5-11.)

Moreover, plaintiff has produced one disciplinary warning she received on Adventureland letterhead and a notice addressed to "Dear Staff" on joint Adventureland and Brite letterhead.  (See Strohl Aff. ¶ 5 & Ex. 2.)  In the latter document, both the letterhead and the text of the notice imply that the two defendants' operations were interrelated.  Defendants explain that the former document was "a mistake" (Tr. at 27:24) and suggest that they created the latter document in connection with a special joint summer program (Tr. at 27:25-30:13). They also argue "that the Courts have held that two companies sharing letterhead for economic purposes does not create nor support the presumption that they are an integrated employer . . . . If anything, the Courts are supportive of this type of arrangement" because it allows small businesses to capitalize on economies of scale.  (Defendants' Joint Reply Brief in Support of Defendants' Motions for Summary Judgment ("Defs.' Reply"), dated Jan. 19, 2009, at 13 (citing Engelhardt v. S.P. Richards Co., 472 F.3d 1 (1st Cir. 2006); Hukill v. Auto Care, Inc., 192 F.3d 437 (4th Cir. 1999); Papa v. Katy Indus., 166 F.3d 937, 939 (7th Cir. 1999)).)  It should be noted, however, that the cases defendants cite for that proposition all concern what are essentially parent corporations and their subsidiaries, but integrated employment can just as well occur in the context of "separate corporations under common ownership and management," Arculeo v. On-Site Sales & Mktg., L.L.C., 425 F.3d 193, 198 (2d Cir. 2005), which is the theory plaintiff advances here.  Defendants' economies-of-scale explanation does not help its case under a "common ownership and management" theory.  See Engelhardt, 472 F.3d at 8 ("[A

wholly owned subsidiary]'s capitalization on cost efficiencies through [arm's-length transactions with its parent company] is irrelevant [to the question of employer integration] because those efficiencies do not come from common management and common operations. It is the latter that would collapse the distinct economic identity of each entity, which is the basis for the exception to FMLA liability.").

Finally, as with the previous factor, Glenn Schroter's prior testimony offers some additional support for plaintiff's position. (See Bobo Tr. at 5:12-13 ("Bobo Worldwide is a partner of Bright Adventure Center and Adventureland."), 5:19-21 ("That school [at the Woodside location] consists of two licenses, Bright Adventure Center and Adventureland Child Care Center.").)

### 3. Centralized Control of Labor Relations

At least in the Title VII context, Second Circuit courts "focus [their] inquiry . . . on . . . centralized control of labor relations." Cook, 69 F.3d at 1241; see also Hukill v. Auto Care, Inc., 192 F.3d 437, 442 (4th Cir. 1999) (holding that "control of labor operations is the most critical factor" in the FMLA context). But see Engelhardt v. S.P. Richards Co., 472 F.3d 1, 5 (1st Cir. 2006) (stating that although this factor is most important in the Title VII context, under the FMLA "the four factors merit equal consideration given the plain language of 29 C.F.R. § 825.104(c)(2)."). Here, defendants argue that "neither defendant is authorized to hire or fire the employees of the other, nor does either company supervise the work schedules or daily operations of the other." (Brite's Mem. 25; accord Adventureland's Mem. at 12.) However, as plaintiffs note and defendants acknowledge, "the same individual prepared the policies (and policy manual) which appl[y] to both Defendants"; "[t]he Defendants have similar pay scales

and share forms, such as warning notices"; and "when an employee is fired from one Defendant for violating its policies, that person's employment is terminated with both Defendants." (Pl.'s Mem. at 10-11; see also Tr. at 39:14-40:4.) Finally, Brite and Adventureland shared a single site manager at the Woodside location, Nancy Picart ("Picart"), but had different site managers at their other shared facility. (See, e.g., Schroter Tr. at 23:10-21; Tr. at 48:12-23; see also Brite's Mem. at 21 (noting that "[n]one of the site managers had the authority to hire and fire employees").)

        4.       Degree of Common Ownership/Financial Control

Joan Lawless is the sole owner of Brite, and she and her two daughters each own one third of Adventureland. (See Schroter Tr. at 18:9-13, 19:7-9; see also Adventureland's Mem. at 12.)

Viewing all of the above evidence in the light most favorable to plaintiff, I cannot conclude that there are no genuine issues of material fact as to whether Brite and Adventureland satisfy the integrated employer test. Accordingly, summary judgment for defendants would not be appropriate on the question of whether plaintiff's employer was covered by the FMLA.

        **C.**       **Whether Plaintiff's Request for a Day Off Triggered the FMLA**

Defendants contend that a request in advance for a day off to keep various appointments, one of them a medical visit connected with recurring migraines, does not trigger FMLA protections. Specifically, they state that "Plaintiff did not suffer any incapacity rendering her unable to perform her work," that "Plaintiff's scheduling of an appointment nearly a month in advance suggests that there was no urgency involved in seeing her physician," and that she

"fail[ed] to give notice to B[rite] of any serious medical condition." (Brite's Mem. at 28; accord Adventureland's Mem. at 15-16.) Defendants also contend that plaintiff "admitt[ed] that she was capable of performing her duties on January 23, 2007" and that this admission "precludes any FMLA claim as she cannot establish that her condition prevented her from performing the essential functions of her job." (Defs.' Reply at 13.) Defendants' arguments raise a number of questions.

First, would plaintiff's alleged migraines qualify as a "serious health condition" under the FMLA? The statute defines that term as including "[a] physical or mental condition that involves . . . continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(B). Under the governing regulations, one type of serious health condition is "[a]ny period of incapacity or treatment for such incapacity due to a chronic serious health condition." 29 C.F.R. § 825.115(c). (See also Pl.'s Mem. at 13 (alleging that her migraines fell into this category).) Under section 825.115(c), a "chronic serious health condition" must satisfy three elements: it must "[r]equire[] periodic visits (defined as at least twice a year) for treatment by a health care provider," § 825.115(c)(1); it must "[c]ontinue[] over an extended period of time," § 825.115(c)(2); and it "[m]ay cause episodic rather than a continuing period of incapacity," § 825.115(c)(3). Plaintiff alleges all three elements. (See Strohl Aff. ¶¶ 11-12.) Defendants argue that plaintiff's medical records only rarely mention migraines (see Tr. at 6:5-7:12, 14:7-12) and that plaintiff has not adequately pleaded "incapacity" (see Brite's Mem. at 27), but plaintiff states in her affidavit that she has "made at least 50 doctor visits over the last 8 years due to [her] condition and ha[s] had more than 10 prescriptions for different medications" (Strohl Aff. ¶ 12; see also Strohl Aff. ¶¶ 10-11), and the record also includes a letter from plaintiff to her

site manager stating that she experiences "severe" and "chronic migraine headaches" (Letter from Yajaira Strohl to Nancy Picart, dated Apr. 16, 2004 ("4/16/04 Ltr."), attached as Ex. 3 to Strohl Aff.) and a doctor's note stating that plaintiff "was home sick with a migraine headache today" (Note from Harold German, M.D., dated Oct. 12, 2004, attached as Ex. 3 to Strohl Aff.). In light of this evidence, I find that there is a triable issue of material fact as to whether plaintiff suffered from a chronic serious health condition.[1]

Second, does plaintiff's FMLA claim fail on the ground that she has not shown that her doctor's visit had to take place on January 23, 2007? Defendants state that "[p]laintiff has provided no evidence in support of her claim that she was suffering from a serious medical

---

[1] At oral argument, the court invited defendants to submit a short letter elaborating on the significance to this case of Kosakow v. New Rochelle Radiology Associates, P.C., 274 F.3d 706 (2d Cir. 2001) (see Tr. at 46:4-8), discussed infra. Defendants initially declined (see Tr. at 46:9-13) but later requested permission to "submit a post-argument letter responding to the Court's question and citation of Kosakow" (Letter of Alan Kestenbaum, Esq., dated Jan. 29, 2009). The court so-ordered the request (Order, dated Jan. 30, 2009), and defendants timely submitted their letter (see Letter of Alan Kestenbaum, Esq., dated Feb. 6, 2009 ("Kestenbaum Ltr.")). In addition to discussing Kosakow, however, defendants raised an entirely new argument: that "'an employee requiring FMLA leave for a serious health condition involving continuing treatment by a health care provider must demonstrate a period of incapacity lasting more than three consecutive days.'" (Kestenbaum Ltr. at 3 (quoting Vicioso v. Pisa Bros., Inc., No. 98 Civ. 2027, 1998 WL 355415, at *3 (S.D.N.Y. July 1, 1998) (citing 29 C.F.R. § 825.114(a)(2))).)

Such a belated "argument is not properly before the court." Sandy v. United States, No. 08 MC 306, 2008 WL 4865993, at *2 n.3 (E.D.N.Y. Nov. 7, 2008); see also, e.g., Johnson & Johnson v. Guidant Corp., 525 F. Supp. 2d 336, 359 (S.D.N.Y. 2007) (Lynch, J.) ("Arguments first raised in reply memoranda are not properly considered, and of course the same is true of arguments first raised by letter several months after reply memoranda and all other motion papers have been filed." (internal quotation marks and citation omitted)). Had defendants raised this argument at an earlier stage, plaintiff would have had the opportunity to challenge it on both the facts (see, e.g., Strohl Aff. ¶ 11 ("My migraine headache condition can and has episodically incapacitated me.")) and the law, see, e.g., 73 Fed. Reg. 67,934, 68,079 (Nov. 17, 2008) (amending 29 C.F.R. § 825.114(a)(2) in relevant part as of Jan. 16, 2009). Accordingly, I will not now consider defendants' argument, although they are not precluded from raising it again at a later date.

-11-

condition that required continuing treatment such that she could not perform her duties at work" and that "[p]laintiff does not deny that there was no immediacy in her need to see her doctor." (Defs.' Reply at 6.)  Plaintiff contends that she "was suffering from serious headaches and could not postpone her January 23 appointment further."  (Pl.'s Mem. at 13; accord Strohl Aff. ¶ 18.)  It is not entirely clear which of her appointments this statement refers to, nor is it clear why that appointment could not be further postponed.  (See Tr. at 49:15-50:4 (discussing plaintiff's failure to substantiate this claim).)  However, the FMLA requires neither that an employee be physically unable to work on the day of her treatment nor that the need for the treatment be immediate; it is enough that the employee's medical condition requires her to miss some day of work for medical treatment.  Here, I find that plaintiff has raised enough of a question about her need to see the doctor, and her need to do so on January 23, 2007, to survive defendants' motion for summary judgment.[2]

Third, "was . . . the intent of the statute to allow an individual to take a day off, akin to a sick day or personal day, where the serious health condition is not the sole cause of taking the day off[?]"  (Defs.' Reply at 6.)  So long as an individual has a legitimate, FMLA-protected reason to miss a day of work, it is unobjectionable for her also to run other errands on that day.  See Jennings v. Mid-American Energy Co., 282 F. Supp. 2d 954, 961-62 (S.D. Iowa

---

[2] Defendants also state that plaintiff "admitt[ed] that she was capable of performing her duties on January 23, 2007."  (Defs.' Reply at 13; see also Defs.' Reply at 6, 11.)  This is apparently a reference to the following exchange from her deposition: "Q: Ma'am, did you know if you did not come to work the next day that your employment could be terminated?  A: Yes, but I didn't report myself because she let me go, not because I couldn't come."  (Transcript of Deposition of Yajaira Strohl of Nov. 17, 2008 ("Nov. 17 Dep. Tr."), attached as Ex. A to Defs.' Reply, at 95:5-10; see also Defs.' Reply at 4.)  The most plausible interpretation of plaintiff's remark is not that she was admitting capacity, but that she did not report to work because she understood herself to have been fired.

2003) ("The FMLA contains no requirement that an individual on intermittent medical leave must immediately return home, shut the blinds, and emerge only when prepared to return to work. Such a rule would be both unreasonable and impossible.").

Fourth, did plaintiff provide adequate notice to her employer? "In determining whether adequate notice of the need for FMLA leave was given to an employer, 'the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" Barnett v. Revere Smelting & Ref. Corp., 67 F. Supp. 2d 378, 385 (S.D.N.Y. 1999) (quoting Manuel v. Westlake Polymers Corp., 66 F.3d 758, 764 (5th Cir. 1995)). "An employee seeking leave need not expressly invoke the FMLA in her notification; it is sufficient that she give a basis for her leave that qualifies under the FMLA." Brown v. Pension Bds., 488 F. Supp. 2d 395, 408-09 (S.D.N.Y. 2007). On the question of employer notice, plaintiff has presented enough evidence to survive defendants' summary-judgment motion. (See, e.g., 4/16/04 Ltr.; Strohl Aff. ¶ 13 (stating that plaintiff had obtained permission from Picart to miss one day of work "due to a doctor['s] appointment for my migraine and another appointment" and that plaintiff "had specifically made Ms. Picart aware that I would be getting treatment for my migraine headache condition"); Letter from Yajaira Strohl to Nancy Picart, dated Jan. 2, 2007 ("1/2/07 Ltr."), attached as Ex. 4 to Strohl Aff. ("I am writing this letter to let you know in advance that I will be absent from work . . . because I have a Doctor's appointment and another appointment.").)

### D. Whether Plaintiff Worked at Least 1,250 Hours in the Preceding Twelve Months

Plaintiff's FMLA claim also turns on her having worked more hours than her timesheets indicate. The FMLA does not cover employees unless they worked for their

employer "for at least 1,250 hours of service . . . during the previous 12-month period." 29 U.S.C. § 2611(2)(A)(ii). Plaintiff's timesheets for the twelve months preceding her termination credit her for 1174.75 hours, or 75.25 hours too few. (See Payroll Records for January 23, 2006 to January 22, 2007, attached as Ex. C to Kestenbaum Decl.) Plaintiff alleges, however, that she performed well over 75.25 hours of uncompensated work in that year, including routinely preparing her classroom before the start of business hours at 8:00 a.m., writing "Child Observation Records" during evenings and weekends, and supervising children while nominally on break. (Strohl Aff. ¶¶ 21-25.) She supports this claim with testimony Picart gave in an unrelated proceeding. (Bobo Tr. at 20:9-13 ("Q: Why is it important for the employer to have somebody there at 7:30? A [Nancy Picart]: Because the children arrive by 7:30, they start to come in the door, and we need staff there to watch them. That's our business.").) Plaintiff further alleges that defendants "regularly shaved and/or rounded [her] hours," and that if her hours were calculated correctly, she would have been credited for 1225.7 hours on the clock during the relevant period. (Abrams Cert. ¶¶ 7-10.)

Defendants dispute plaintiff's contention that she worked more hours than her timesheets reflect. (E.g., Brite's Mem. at 18-19.) As for Picart's testimony, they argue that Adventureland employees sometimes had to begin greeting arriving children at 7:30, but that plaintiff worked only for Brite, where the students arrived no earlier than 8:00. (Defs.' Reply at 14; see also Affidavit of Glenn Schroter in Support of Defendants' Reply Brief, dated Jan. 18, 2009, ¶¶ 4-7.) Whether plaintiff performed tasks not just for Brite but also for Adventureland is, however, in dispute. Furthermore, plaintiff claims that she regularly started work before 8:00 not because children had already arrived but because doing so was necessary to prepare for their

arrival.  This situation is for all relevant purposes indistinguishable from that in <u>Kosakow v. New Rochelle Radiology Associates, P.C.</u>, 274 F.3d 706, 716-19 (2d Cir. 2001), in which the Second Circuit held that summary judgment for an employer was inappropriate where the plaintiff claimed by affidavit that her daily work obligations began before the official start of her shift.[3]

Defendants also deny that the systematic rounding of hours to the nearest fifteen minutes could have prejudiced plaintiff.  (<u>E.g.</u>, Brite's Mem. at 19.)  While plaintiff's allegations on this point alone would not enable her to reach 1250 hours, adding some additional hours could help her pass that threshold, and summary judgment for defendants on the rounding of hours would not be appropriate.

### E. New York City Human Rights Law

New York City's Human Rights Law obligates employers to reasonably accommodate employees' disabilities.  N.Y.C. Admin. Code § 8-107(1)(a), (15).  Here, plaintiff alleges that defendants "failed to accommodate [her disability] by giving her a day off for medical treatment."  (Pl.'s Mem. at 17.)  Brite claims plaintiff never gave it notice that she had a disability requiring accommodation.  (Brite's Mem. at 29.)  As discussed <u>supra</u>, plaintiff has

---

[3] Defendants' efforts to distinguish <u>Kosakow</u> are unpersuasive.  They suggest that the <u>Kosakow</u> court "relied heavily on the independent affidavits . . . verifying the plaintiff's allegations that she had in fact performed those duties each morning, and that the work was a necessary part of the activities for which she was employed."  (Letter of Alan Kestenbaum, Esq., dated Feb. 6, 2009 ("Kestenbaum Ltr."), at 2.)  But the court in <u>Kosakow</u> was careful to note that "[b]ecause [the plaintiff] is not actually challenging the documentary evidence[, i.e., the timesheets], her affidavit alone should have been sufficient to create a genuine issue of fact."  274 F.3d at 716 n.1.  The same is true here.  Defendants also urge that "[t]here were no tasks that Ms. Strohl was required to perform prior to 8:00 a.m. that demanded her presence in the school."  (Kestenbaum Ltr. at 2.)  Plaintiff, on the other hand, claims she "regularly performed work for the Defendants before 8:00 AM such as preparing the classroom for the day."  (Strohl Aff. ¶ 21.)  The court cannot resolve this factual dispute on summary judgment.

submitted evidence on the question of notice creating a triable issue of material fact. (Pl.'s Mem. at 18; see also Strohl Aff. ¶¶ 8-9, 13; 4/16/04 Ltr.; 1/2/07 Ltr.)

Adventureland, on the other hand, claims it never employed plaintiff at all, and thus could not have been required to accommodate any disabilities she might have. (Adventureland's Br. at 16.) To decide whether Adventureland was plaintiff's employer under New York City's Human Rights Law,

> the Court must consider the following elements: 1) whether the proposed employer had the power of the selection and engagement of the employee; 2) whether the proposed employer made the payment of salary or wages to the employee; 3) whether the proposed employer had the power of dismissal over the employee; and 4) whether the proposed employer had the power to control the employee's conduct.

Alie v. NYNEX Corp., 158 F.R.D. 239, 246 (E.D.N.Y. 1994). "Whether the alleged employer exercised control over the employee's conduct and the incidents of his employment remains the most important consideration in this analysis." Id. As discussed supra, there are genuine disputes of material fact, e.g., whether Picart ever directed plaintiff to "cover" for Adventureland employees, that rule out summary judgment for Adventureland on this point.

### F. New York State Labor Law

State law mandates timely, full payment of wages, see N.Y. Lab. Law § 191, and restricts "deductions" from wages, see id. § 193. Plaintiff's argument under both provisions is based on her claims that she worked more hours than her timesheets reflect. (See Pl.'s Mem. at 18-19.) Her claim under section 191 survives summary judgment, but her claim under section 193 misconstrues the meaning of "deductions."

Brite's argument under section 191 is simply that plaintiff did not work the extra

hours she alleges (see Brite's Mem. at 29), but as explained supra, there are triable issues of material fact precluding summary judgment on that point. Adventureland again asserts that it did not employ plaintiff (see Adventureland's Mem. at 16), but it does not argue, let alone establish, that it cannot be liable to her under the integrated employer test or the test set forth in Alie.

Plaintiff's argument under section 193 is that defendants "[i]n essence" made deductions from her wages "by adjusting Ms. Strohl's total hours downward for occasions when she punched in after 8:00 AM or before 8:00 AM." (Pl.'s Mem. at 18.) Plaintiff's reading of section 193 is overly broad. The purpose of that statute is "to place the risk of loss for such things as damaged or spoiled merchandise on the employer rather than the employee." Hudacs v. Frito-Lay, Inc., 683 N.E.2d 322, 325 (N.Y. 1997). Here, with the facts viewed in the light most favorable to plaintiff, defendants did not "deduct" any amounts from her wages, but simply failed to pay her all the wages she had earned. See Ireton-Hewitt v. Champion Home Builders Co., 501 F. Supp. 2d 341, 353 (N.D.N.Y 2007) ("Champion did not make unauthorized deductions from Ireton-Hewitt's vacation or severance pay. Rather, it never tendered payment of unused vacation pay and severance pay to plaintiff. Since these activities do not fall within the realm of § 193, an issue of fact does not exist.").

**CONCLUSION**

For the above reasons, defendants' motion for summary judgment is granted with respect to plaintiff's claim under New York Labor Law section 193 and denied in all other respects.

SO ORDERED.

Dated: Brooklyn, New York
August 28, 2009

>                        /s/
> ROBERT M. LEVY
> United States Magistrate Judge